UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DEALER COMPUTER SERVICES, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-10-2132 |
| MICHAEL MOTOR COMPANY, INC., | § § § | |
| Defendant. | § § | |

## MEMORANDUM AND ORDER

Pending before the Court are Defendant's First Amended Motion to Vacate Arbitration Award (Doc. No. 9) and Plaintiff's Amended Motion to Strike Affidavit of Mark Counts (Doc. No. 11). After considering the parties' filings and the applicable law, the Court finds that the Motion to Vacate should be granted and that the Motion to Strike should be denied.

I.  BACKGROUND

Plaintiff Dealer Computer Services, Inc. ("DCS") is a corporation that provides computer hardware, licenses computer software, and provides hardware maintenance and software support to automobile dealers. (Doc. No. 1-1, at 1.) Defendant Michael Motor Company, Inc. ("Michael Motor") is an automobile dealership doing business in West Virginia. (*Id.*) The parties entered into a contract in 1995 (the "Contract") in which Michael Motor purchased a computer system from DCS and DCS agreed to service that system. (Doc. No. 1-2.) The Contract required the parties to arbitrate disputes between

1

them in accordance with the commercial rules of the American Arbitration Association and governed by Michigan law. (*Id.* at 14-15.) Pursuant to the Contract, Michael Motor was provided DCS's "7000 MP" server for Michael Motor's dealership computer system under a "no-charge replacement" program. (Doc. No. 1-1, at 2.) A dispute arose in 2006 when DCS informed its customers, including Michael Motor, that a new software release "will require dealerships using the 7000MP server to upgrade to a new X model server." (Doc. No. 9-6.) Michael Motor alleged that this constituted an intention by DCS to breach the Contract.

Michael Motor did not upgrade to the new server, and instead filed a demand for arbitration. An arbitration proceeding (the "Michael Motor Arbitration") was held in April 2010. A panel of three neutral arbitrators, including one chosen by each party, ruled unanimously in favor of DCS. (Doc. No. 1-1.)

Michael Motor's instant motion to vacate involves allegations of evident partiality by Carol S. Butner, Esq., who served as DCS's appointed neutral arbitrator in the Michael Motor Arbitration.[1] Butner submitted a memorandum of disclosure to the AAA which stated:

> Please consider this memorandum as my disclosure in the matter of Michael Motor Company and Dealer Computer Services, Inc.
>
> I served on panel [sic] of three arbitrators that considered a dispute between Dealer Computer Services, Inc. and another party. I do not believe that my service on that panel creates a conflict with my serving in this case.

---

[1] A letter to Michael Motor and DCS from a case manager from the American Arbitration Association ("AAA") stated, "In accordance with the Rules, party appointed arbitrators are neutral unless the parties agree otherwise. Therefore, absent notification of your agreement on or before the party appointed arbitrators will be neutral." (Doc. No. 9-10.) Neither party argues that Butner was to be non-neutral in the Michael Motor Arbitration.

2

(Doc. No. 9-13.) Along with the memorandum, Butner submitted to the AAA a response to a questionnaire with "YES" or "NO" checkboxes regarding her impartiality in the case. She also signed certifications about compensation for the arbitration and acceptance of responsibility as arbitrator.[2] (*Id.* at 2-4.) On the questionnaire, Butner answered "NO" to all questions except "Have any of the party representatives, law firms or parties appeared before you in past arbitration cases?" (to which she answered "YES") and "Have you, any member of your family, or any close social or business associate ever served as an arbitrator in a proceeding in which any of the identified witnesses or named individual parties gave testimony?" (to which she checked neither box but put a question mark in between the boxes). (*Id.* at 2.) Butner did not disclose any additional information about the previous arbitration panel on which she served in a case involving DCS.

After the panel in the Michael Motor Arbitration issued its award, counsel for Michael Motor learned that Butner's prior service had been in an arbitration between DCS and another automobile dealership, Venus Ford ("Venus Ford Arbitration"). (Doc. No. 9-9, at 3.) Butner had on January 25, 2008 signed an eight-page opinion ruling for DCS in that arbitration. (Doc. No. 9-14.) The same law firm, John C. Allen, P.C., represented DCS in both the Venus Ford and Michael Motor arbitrations.

---

[2] The "acceptance of responsibility as arbitrator" form states:
> In accordance with the Code of Ethics please disclose any past or present relationship with the parties, their counsel, or potential witnesses, direct or indirect, whether financial, professional, social or of any other kind. If any additional direct or indirect contact arises during the course of the arbitration or if there is any change at any time in the biographical information that you have provided to the AAA, it must also be disclosed. Any doubts should be resolved in favor of disclosure. If you are aware of direct or indirect contact with such individuals, please describe it below. The AAA will call the facts to the attention of the parties' counsel.

*Id.* at 4.

At issue in the Venus Ford Arbitration was a contract nearly identical to the one at issue in the Michael Motor Arbitration.[3] Both arbitrations focused on Section 7(A)(3), which is identical in the two contracts and which is quoted in full in both arbitration opinions.[4] In both cases, Butner and the other arbitrators accepted DCS's interpretation of Section 7(A)(3), holding that DCS did not commit fraud or breach the contract when it phased out its 7000 MP server in favor of a new one. (*See, e.g.*, Doc. No. 9-14, at 3 ("Venus Ford argues, in effect, that because it contracted for a 7000 MP system, it was defrauded when DCS came out with its 9000 MPX system. We reject this claim of fraud."); *id.* at 4 ("this introduction of the 9000 MPX and consequent phasing out of the 7000 series was not a breach of the contract by DCS"); Doc. No. 1-1, at 2 ("DCS did not commit fraud against [Michael Motor]. Section 7(a)(3) of the Contact [sic] expressly stated that there was no guarantee that the (1995) 'no-charge replacement' operating system, application programs and hardware would continue with [sic] to be able to provide the '*added Software functionality provided by Enhancements/Modifications*' in the future.") (emphasis in original); *id.* at 2 ("DCS did not breach the Contract. DCS continued to provide support to [Michael Motor] under the terms set forth in the Contract.")) In fact, the Venus Ford order found that Section 7(A)(3) "clearly

---

[3] DCS's contracts with Venus Ford (Doc. No. 9-33) and Michael Motor (Doc. No. 1-2) are both sixteen pages long (excluding addenda) and use almost the exact same form. Although one form is marked "1993" and the other "1994," and other slight differences exist, DCS does not dispute that the contractual language is identical for all purposes relevant to this motion.

[4] Section 7(A)(3) of each contract provides:
> FDCS will, from time-to-time, in its sole discretion, make Modifications and Enhancements to the Operating System and Application Programs. During the term of this Agreement, Dealer shall receive all generally released Enhancements/Modifications and Documentation applicable thereto. Dealer acknowledges and agrees that these Enhancements/Modifications may at times require changes or expansion to Dealer's computer system such as computer power, memory, disk storage, ports, or peripherals. Dealer agrees to make such changes or expansion at its expense as a necessary cost of obtaining the added Software functionality by the Enhancements/Modifications.

(Doc. Nos, 9-33, at 8, 1-2, at 8.)

4

contemplates that something akin to the 9000 MPK [sic] roll-out would occur." (Doc. No. 9-14, at 3.)

Sheri Robinson, Vice President and head of accounting at DCS, testified as a damages expert in both arbitrations. (Doc. Nos. 9-40, 9-41, 9-37, 9-40, 9-41.) In their respective arbitrations, Venus Ford and Michael Motor both presented competing damages experts. (Doc. Nos. 9-14, at 5; 9-38; 9-39.) In the Venus Ford Arbitration, the order signed by Butner explicitly found Robinson's "analyses and calculations to be reasonable, accurate, and within the framework of Michigan law," and "adopt[ed] her conclusions." (Doc. No. 9-14, at 5.) In the Michael Motor Arbitration, with much less discussion, the panel found that "DCS is entitled to recover its 'net' lost profits as damages" of $309,536.65, along with expenses of $44.890.33 and attorney's fees of $214,167.00. (Doc. No. 1-1, at 3.)

Two additional witnesses, Nicholas D'Ambrosio and Donny Holendar, testified at the Venus Ford arbitration on topics that Michael Motor argues bore on the issues in the Michael Motor Arbitration. D'Ambrosio, an expert on economic damages, testified in the Venus Ford Arbitration in support of Robinson's damages analysis. (*See, e.g.*, Doc. No. 9-36, at 4 ("Q: Does Ms. Robinson's analysis based upon avoidable cost, does it fairly characterize the damage or the lost profit calculations? A: It is clearly the right approach and methodology as described in the AICPA literature and in the case law.")) D'Ambrosio was designated as an expert in the Michael Motor Arbitration but was not called as a witness. (Doc. No. 9-16, at 4.)[5] Holendar, a former vice-president of sales for DCS, testified in the Venus Ford Arbitration about DCS's perspective on why Section

---

[5] Michael Motor has not provided any exhibit that shows all of the witnesses who actually testified at the Michael Motor Arbitration, but DCS does not argue that D'Ambrosio testified in that proceeding.

7(A)(3) is included in contracts with customers. (*See, e.g.*, Doc. No. 9-35, at 16 ("we are notifying the dealers in the contract that we provide these enhancements and that at any given time they may be required to upgrade their hardware at their expense to accommodate the release").)[6] Holendar was not designated as a witness in the Michael Motor Arbitration. (Doc. No. 9-16.)

Following the panel's order in the Michael Motor Arbitration, DCS filed suit in this Court to confirm the award. Michael Motor then filed this Motion to Vacate.

## II. MOTION TO STRIKE

DCS argues that it is inappropriate for the Court to consider the affidavit of Mark Counts (attorney for Michael Motor) in determining whether to vacate the arbitration award because it contains hearsay and statements not based on personal knowledge. At least one district court has held that the requirements of Federal Rule of Civil Procedure 56—that an affidavit supporting summary judgment be "made on personal knowledge" and "set out facts that would be admissible in evidence"[7]—do not apply in motions to vacate arbitration awards. *Gwynn v. Clubine*, 302 F. Supp. 2d 151, 159 (W.D.N.Y. 2004). Instead, affidavits in this context need only comply with the requirements of Rule 11(b), which impose a lower standard on all representations to the court.[8] *Id.* at 159. Thus,

---

[6] *See also id.* ("Q: Is this provision of hardware upgrades requiring the dealers to buy hardware upgrades, is that a standard in the industry? A: Yes, it is.").
[7] The requirements are set forth in Rule 56(c)(4). Prior to the amendments that went into effect on December 1, 2010, these requirements were set forth in Rule 56(e)(1).
[8] Rule 11(b) provides:
> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

6

affidavits supporting a motion to vacate an arbitration award need not "be based upon personal knowledge, but may be based on a reasonable belief upon inquiry into the relevant circumstances." *Id.* DCS has provided no authority to the contrary, nor has the Court found any.

The Counts Affidavit includes assertions about which Counts does not purport to have personal knowledge, and assertions that would not be admissible at trial. The Court will consider those factors in assessing how much (if any) weight to give each assertion. However, applying the *Gwynn* standard, the assertions need not be excluded entirely in the motion to vacate context. Accordingly, DCS's Motion to Strike is denied.

### III. MOTION TO VACATE

#### A. Legal Standard

"To assure that arbitration serves as an efficient and cost-effective alternative to litigation, and to hold parties to their agreements to arbitrate, the [Federal Arbitration Act ("FAA")] narrowly restricts judicial review of arbitrators' awards." *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 280 (5th Cir. 2007) (en banc); *see also Lummus Global Amazonas S.A. v. Aguaytia Energy del Peru S.R. Ltda.*, 256 F. Supp. 2d 594, 604 (S.D. Tex. 2002) ("Judicial review of arbitrators' decisions is extraordinarily narrow under the Federal Arbitration Act.") (internal quotation marks

---

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

omitted). However, the FAA authorizes courts to vacate arbitration awards in four circumstances:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). "Review on these grounds is necessarily narrow, limited to determining whether the arbitration proceeding was fundamentally unfair." *Lummus Global Amazonas*, 256 F. Supp. 2d at 605. "The party moving to vacate an arbitration award has the burden of proof." *Id.* at 604.

With regard to the second prong, "evident partiality" may be based on nondisclosure of information by an arbitrator if it "involve[s] a significant compromising connection to the parties." *Positive Software Solutions*, 476 F.3d at 282-83; *see also id.* at 283 ("The 'reasonable impression of bias' standard is thus interpreted practically rather than with utmost rigor.").[9] "In nondisclosure cases, a showing of actual bias is not required." *Fidelity Federal Bank, FSB v. Durga Ma Corp.*, 386 F.3d 1306, 1312 (9th Cir. 2004); *see also Positive Software Solutions*, 476 F.3d at 285 (contrasting "nondisclosure" and "actual bias" claims).

### B. Analysis

---

[9] In adopting this standard, the en banc Fifth Circuit analyzed *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145 (1968), and found Justice White's concurring opinion (as the fifth vote) to be controlling, rather than Justice Black's opinion for the Court. *Positive Software Solutions*, 476 F.3d at 281-83.

The Court finds that Butner's conduct created a "reasonable impression of bias" and rose to the level of "evident partiality" as interpreted in *Positive Software Solutions*. Butner's prior experience serving on the *Venus Ford* arbitration panel creates a strong impression that she had already decided disputed issues in the Michael Motor Arbitration before it began. First, Butner had previously considered evidence and legal arguments about the proper interpretation of Section 7(A)(3) of DCS's form contract, and had concluded that DCS's interpretation was correct. (Doc. No. 9-14, at 2-4.) Second, Butner had previously heard over a day's worth of testimony from DCS's damages expert, Sheri Robinson, and had already concluded that Robinson's method for calculating damages was accurate, reasonable, and within the framework of Michigan law, and that it should be adopted. (*Id.* at 4-8; *see* Doc. Nos. 9-40 and 9-41.) Third, Butner had previously heard testimony from Nicholas D'Ambrosio, who provided additional support for Robinson's damages theories, and Donny Holendar, who supported DCS's interpretation of Section 7(A)(3), neither of whom testified in the Michael Motor Arbitration. (Doc. No. 9-36.)

Taken as a whole, Butner's prior exposure to the legal issues and witnesses involved in the Michael Motor arbitration creates a reasonable impression that she had prejudged at least some of the issues in the arbitration. It would be unreasonable to expect an arbitrator who had already signed an eight-page opinion ruling for a party as to how a contractual provision should be interpreted to change her mind in a subsequent arbitration and rule against that party on the exact same contractual provision. Likewise, it would be unreasonable to expect an arbitrator who had fully adopted the damages theories of an expert witness to then reject the damages theories of that same witness on similar issues in a subsequent arbitration. It is also reasonable to believe that Butner may have

considered D'Ambrosio's and Holendar's testimony from the Venus Ford Arbitration in evaluating evidence in the Michael Motor Arbitration. Under the "practical" rather than "utmost rigor" standard of *Positive Software Solutions*, 476 F.3d at 283, these prior connections to DCS and to the issues in the arbitration are not mere technicalities, but strongly suggest that Butner may have prejudged the liability and damages issues in the Michael Motor Arbitration. The Court concludes that Butner's participation in the Venus Ford Arbitration is "a significant compromising connection" to DCS, and her failure to disclose that participation constitutes "evident partiality." *See id.* at 282-83; 9 U.S.C. § 10(a)(2).[10]

None of the cases cited by DCS in which an arbitration awards were confirmed involved an arbitrator's failure to disclose such strong evidence that she had already considered—and decided—the disputed issues of the arbitration. In *ANR Coal Co., Inc. v. Cogentrix of North Carolina, Inc.*, the Fourth Circuit confirmed an award despite an arbitrator's failure to disclose that his law firm had previously represented Carolina Power, the sole customer of Cogentrix, whom ANR Coal argued "would have passed the costs" of any breach of contract found in the arbitration on to Carolina Power. 173 F.3d 493, 501 (4th Cir. 1999). However, the arbitrator himself "never personally represented" Carolina Power. *Id.* at 496. Furthermore, the court found that the relationship was "a step removed from the arbitration proceeding" because Carolina Power "was not a party to the arbitration" and because there was "no evidence that the contractual relationship between

---

[10] By contrast, the alleged partiality in *Positive Software Solutions*, which the court found "does not come close to meeting this standard," *id.* at 286, was based on the arbitrator and one of the prevailing party's attorneys having both represented Intel years earlier in litigation in which "Intel was represented by seven law firms and at least thirty-four lawyers." *Id.* at 280. Moreover, the arbitrator and the party's attorney "never attended or participated in any meetings, telephone calls, hearings, depositions, or trials together." *Id.* Thus, while the undisclosed information in *Positive Software Solutions* was "a trivial former business relationship," *id.* at 283, Butner's prior experience here "significant[ly] compromise[ed]" her ability to act impartially in the Michael Motor Arbitration. *Id.* at 286.

Carolina Power and Congentrix required, or permitted, these costs to be passed on to Carolina Power; and no evidence that even if this happened it would have affected Carolina Power's relationship with [the law firm]." *Id.* at 501. In *Nationwide Mutual Ins. Co. v. Home Ins. Co.*, the Sixth Circuit confirmed an award despite an arbitrator having previously served as party arbitrator for one defendant six times and for another defendant at least eighteen times. 429 F.3d 640, 647-48 (6th Cir. 2005). However, the court noted, "this is not even a case of nondisclosure" because the arbitrator "made full and timely disclosures regarding his business relationship[s]" with the defendants, and the "disclosures were not deficient." *Id.* at 648-49. Furthermore, the arbitrator's prior service was limited to "unrelated matters." *Id.* at 649. Finally, the arbitrator in *Nationwide Mutual* was a non-neutral party-appointed arbitrator. *Id.* at 647 n.9 (distinguishing cases as "inapposite" because they "involve[ed] neutral arbitrators").[11]

The instant case is readily distinguishable from *ANR Coal*, *Nationwide Mutual*, and every other case in the Fifth Circuit and elsewhere that DCS has cited or that the Court has found. Butner, a party-appointed *neutral* arbitrator, failed to disclose that she was *personally involved* in a prior arbitration that involved the *same issues* of contractual interpretation and damages calculation, as well as related witnesses. Unlike in *ANR Coal* and *Nationwide Mutual*, Butner failed to disclose a connection to DCS that significantly compromised her ability to act impartially.

---

[11] In contrast to *Nationwide Mutual*, the court in *Crow Construction v. Jeffrey M. Brown Assoc. Inc.* vacated the arbitration award where two of the arbitrators had, among other things, served in another arbitration involving one of the parties and failed to disclose that service to the other party. 264 F. Supp. 2d 217, 225 (E.D. Pa. 2003). The court found that "the arbitrators' hearing another case involving JMB could lead to consideration of facts about Plaintiff JMB which are largely irrelevant to the JMB/Crow matter. More importantly, any facts taken from the JMB/Greenfield matter either consciously or sub-consciously would go unaddressed by Crow." *Id.*

11

DCS argues that Butner's disclosure to the AAA was sufficient, and that she did not need to disclose any additional information about the previous arbitration. The Court disagrees, and finds that Butner's acknowledgement that she had "served on panel [sic] of three arbitrators that considered a dispute between Dealer Computer Services, Inc. and another party" was insufficient to satisfy her duty to disclose information bearing on partiality. Without specifying which prior arbitration she participated in, or disclosing that the same contractual provision and the same expert witness were involved, Butner did not put Michael Motor on notice of the degree or even the kind of her potential partiality.

Finally, DCS argues that Michael Motor waived its objections to Butner's evident partiality by failing to raise them before the arbitration award was issued. The Court again disagrees. A party seeking to vacate an arbitration award on the grounds of evident partiality generally must object during the arbitration or else waive such objection. *Bernstein Seawell & Kove v. Bosarge*, 813 F.2d 726, 732 (5th Cir. 1987). With nondisclosure claims, however, such a strict rule would be paradoxical: if the arbitrator completely failed to disclose a potential conflict, the objecting party could not know about it in order to object, and the broad disclosure requirements for arbitrators would become merely symbolic. As a result, courts in the Fifth Circuit have required some type of notice to the objecting party of potential partiality before finding waiver. Relying on Sixth and Eleventh Circuit precedent, the Fifth Circuit panel in *Positive Software Solutions* (which was later vacated by the en banc court on grounds unrelated to waiver) held that, to waive a nondisclosure objection, "one must have *actual knowledge* of the presence of a conflict of interest before one can waive the conflict." *Positive Software*

*Solutions, Inc. v. New Century Mortg. Corp.*, 436 F.3d 495, 505 (5th Cir. 2006) (emphasis added) (citing *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1359 (6th Cir. 1989) and *Middlesex Mut. Ins. Co. v. Levine*, 675 F.2d 1197, 1204 (11th Cir. 1982)). The Court explained: "To hold otherwise, would turn the arbitration process on its head by shifting the onus from requiring an arbitrator to assume the duty of disclosure to requiring a party to assume a duty to investigate." *Positive Software Solutions*, 436 F.3d at 505 (panel opinion); *see also Middlesex*, 675 F.2d at 1204 ("By positing that appellants have the duty to inquire into the background of the arbitrator, appellant attempts to shift to the parties to the arbitration the burden of determining and disclosing bias or the reasonable appearance thereof.").[12] Judge Rosenthal in *Lummus Global Amazonas* applied a seemingly stricter rule for waiver, inquiring whether the objecting party was "on notice" and had sufficient information to object during the arbitration. 256 F. Supp. 2d at 625.[13]

The Court need not decide which standard applies for waiver of nondisclosure objections, because under either the "actual knowledge" or "on notice" standard, Michael Motor did not have sufficient information to object during the arbitration, and so did not waive its objections. Assuming that Michael Motor had at least constructive notice of the statement Butner disclosed to the AAA (which Michael Motor disputes), that minimal acknowledgment was not sufficient to put Michael Motor on notice of a potential conflict

---

[12] The status of the "actual knowledge" standard in the Fifth Circuit is unclear, as the en banc court in *Positive Software Solutions* did not address the waiver issue, nor has the court subsequently clarified the applicable standard. *See also Positive Software Solutions*, 436 F.3d at 504 (panel opinion) ("This court has not considered the issue of waiver of a nondisclosure objection.").

[13] Similarly, a Ninth Circuit case cited by DCS held that, at least where "[t]here is no charge or evidence of actual bias and no indication that the arbitration award was anything but fair," waiver applies "where a party to an arbitration has *constructive knowledge* of a potential conflict but fails to timely object." *Fidelity Federal Bank, FSB v. Durga Ma Corp.*, 386 F.3d 1306, 1313 (9th Cir. 2004) (emphasis added). In that case, the court found that constructive knowledge existed because the arbitrator had originally been designated as a "non-neutral party-appointed arbitrator" and was then re-designated as "neutral," so the objecting party was on notice that the arbitrator was "likely to have some personal or professional connection to [the opposing party] or its attorneys." *Id.* at 1312-13.

13

of the sort that was present. It might not be surprising, or troublesome, for a neutral party-appointed arbitrator to have been appointed by that party in a previous arbitration. In other words, one might not expect the party to use a competent arbitrator only once, and find a new competent arbitrator for each proceeding. *See Nationwide Mutual*, 429 F.3d at 645-47 and n.8 (discussing tradeoff between expertise and impartiality) (citing *Sphere Drake Ins. Ltd. v. All American Life Ins. Co.*, 307 F.3d 617, 619-20 (7th Cir. 2002) and *Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 679 (7th Cir. 1983)). It is an entirely different situation, however, where—as here—the arbitrator's prior service concerned the same contract, the same legal issues, and the same expert witness. *See* AAA Code of Ethics for Arbitrators in Commercial Disputes, Comment to Canon I, *available at* http://www.adr.org/sp.asp?id=32124 ("Arbitrators do not contravene this Canon if, by virtue of . . . experience or expertise, they have views on certain general issues likely to arise in the arbitration, but an arbitrator may not have prejudged any of the specific factual or legal determinations to be addressed during the arbitration.").[14] Michael Motor could not have been expected, based on Butner's disclosure, to presume, or even suspect, that Butner's evident partiality was anywhere near as strong as it turned out to be. Accordingly, Michael Motor did not have sufficient information to object to Butner's

---

[14] The AAA Code of Ethics is cited not as a basis for vacatur, but merely to illustrate the distinction between experience or expertise in a field on the one hand and prejudgment of specific factual and legal determinations to be addressed during an arbitration on the other. *See Positive Software Solutions*, 476 F.3d at 285 n.5 ("Whether Shurn's nondisclosure ran afoul of the AAA rules, however, is not before us and plays no role in applying the federal standard embodied in the FAA."); *but see Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 759-60 (11th Cir. 1993) (considering whether arbitration met ethical obligations under AAA Code of Ethics); *Crow Construction*, 264 F. Supp. 2d at 224 ("While [the AAA Code of Ethics] is not a governing standard here, it serves as a benchmark to assess the alleged failed disclosures under the appearance of bias standard and raises the question of the severity of these infractions.");

partiality, or to her nondisclosure, at the time. Michael Motor did not waive its objections.[15]

## IV. CONCLUSION

The Court finds that Michael Motor has met its burden of proving evident partiality on the part of one of the arbitrators. Therefore, the court finds that the Motion to Vacate should **GRANTED**. The arbitration award between DCS and Michael Motor is hereby **VACATED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 29th day of December, 2010.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

---

[15] Because the Court finds evident partiality under 9 U.S.C. § 10(a)(2) based on Butner's failure to disclose information about her previous service on the Venus Ford Arbitration, it need not address the FAA's other grounds for vacating awards, or Michael Motor's arguments based on failure to admit evidence or failure to issue a reasoned award.